WILLAMETTE PULP & PAPER CO. v. BONNER.

(Circuit Court of Appeals, Ninth Circuit. February 1, 1909.)

No. 1,616.

MASTER AND SERVANT (§ 286*)—MASTER'S LIABILITY FOR INJURY TO SERVANT —ACTIONS—QUESTIONS FOR JURY.

In an action by a servant to recover from the master for an injury, where there was evidence tending to support plaintiff's allegation that his injury resulted from the negligence of defendant in failing to sufficiently light a passageway through which plaintiff was required to pass with a truck, and in permitting wet pulp to accumulate on the floor, rendering it dangerous, such issue was properly submitted to the jury.

[Ed. Note.—For other cases, see Master and Servant, Dec. Dig. § 286.*]

In Error to the Circuit Court of the United States for the District of Oregon.

Franklin T. Griffith and Rufus Mallory, for plaintiff in error.

Henry E. McGinn and C. D. Latourette, for defendant in error.

Before GILBERT, ROSS, and MORROW, Circuit Judges.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

ROSS, Circuit Judge. The sole question presented by this writ of error is whether the court below erred in denying a motion made by the defendant to the action for a direction to the jury to return a verdict in its favor.

The action was one for damages for personal injuries sustained by the defendant in error, who was plaintiff in the court below, while trucking pulp. The record shows that the plaintiff had been employed by the defendant company for some time in its paper mills at Oregon City, state of Oregon, as a grinder, but that on the 31st day of October, 1906, he was put to trucking pulp from the warehouse out to the dock, in doing which he had to pass through a long passageway in which there was at one place a rather steep incline. The next day, November 1st, in running the truck, the plaintiff, in going down the incline, stepped on a piece of pulp, slipped and fell, sustaining the injury for which he sued. The ground of his action was the alleged negligence of the defendant in permitting pieces of pulp to so accumulate upon the floor of the passageway, and the floor to be so wet, as to make the passageway dangerous, and also in failing to keep it properly lighted.

There was evidence tending to show those alleged acts of negligence; for example, the plaintiff was questioned, and answered as follows:

"Q. Now, in going from the warehouse to the dock, just explain to the jury about this passageway that you had to go through? A. The passageway is dark all the way through there, principally. Q. Well, where was that—in the mill? A. Yes, sir. Q. You had to go through that, did you? A. Yes, sir. Q. Now, tell the jury about those lights in there. A. The lights where I fell and got my leg broke, where I fell, is, as he told you, there, about that door there, the door there where I come through, we would come like I was going through there; come down through; light comes through that door there. Q. Sit still; you don't need to gesture. Just tell the jury coming from the warehouse where that passage way was situated and how it was lighted. A. Well, I can't like that out myself, for it is a crooked road. I was never in there before. Q. How wide was the passageway—about how wide? A. In the place where I fell and broke my leg, or clear through the mill? Q. Yes, where you fell. A. Some places it was wider than it is in others. On that slip where I broke my leg I think that is something like 6 feet wide. There are other places, I should judge, it is in the neighborhood of 10 or 12 feet wide, I should judge. Q. How was that place lighted? What light was there there? A. There where I broke my leg there was one light sets out on a beam there, like over that door, 25 feet. There is another light. I fell like if that light was right there. Q. 25 or 35? A. 25 feet. Then on down from that one, 36 feet there is another light. There's three lights in that one passage way. Q. How far is it from the light, from the daylight, at the entrance and over down to the next lamp down that passageway? A. It is 25 feet. Q. Down that passageway, is it? A. It is down that passageway there. Q. Now, I am talking about the passageway you went through. How far was it between those two lamps? A. It is 25 feet from the first one. That first one you might say is no lamp there. The daylight, when you come in from there, that light blinds anyway. You can't see nothing there. Q. You think there were about three lights through the passageway? A. I think there were three lights, if I remember right. Q. Was there any other light there—daylight or anything? A. No, sir, there is no light back that way at all more than what you get from those lamps. This way, as Mr. Griffith says, there's lights through there; but coming in from that way, it blinds you instead of giving you light. You can't see nothing; you can't see the bottom. Q. Was there any daylight in that passage-

way. Mr. Bonner? A. No, sir; not only what you get from this place back here. Q. From the end? A. Yes, sir. * * * Q. Could you see the floor of the incline in passing over? A. No, sir. You can't see the bottom of the floor there. It is very dim there. Q. What is that? A. No, sir you can't see the bottom of the floor there when you go through there. Q. What do you mean by the bottom of the floor—the surface? A. Well, the floor of the incline where you are going up that passage. Q. You can't see it at all? A. Well, you might possibly see it by looking; but then you can't see anything—it is just like looking down in a well; you can see down into it, but then you can't see the bottom of it good. * * * Q. Could you see the floor? A. If you had a lantern you might. Q. Did you see the floor at that time? A. No, sir; you can't see the floor down there where I fell without you had a lantern."

Fred Kennedy, a witness for the plaintiff, was questioned, and answered, among other things, as follows:

"Q. You heard the plaintiff testify about this passageway running from the storeroom out to the dock, have you not? A. How is that? Q. Where was he hurt? Now, are you acquainted, were you at that time acquainted, with that passageway? A. I was. Q. How about the light there at that time, Mr. Kennedy? Just tell the jury about those lights. A. The lights were dim, not sufficient. Q. Could you see the floor from those lights? A. I could by hesitating. Q. By what? A. By hesitating there a minute after coming in out of the light. By going slow and hesitating a few minutes, or a minute there, you can see the lights or you can see the floor. Q. Could you at that time see the floor of this incline, or see any pulp? Was the light sufficient at that time, on the floor? A. Yes, sir I think it was sufficient for that. Q. You could see it if you stopped? A. I could see it; yes, sir. Q. If you stopped and hesitated and examined? A. Yes, sir."

J. Sondergard, a witness for the plaintiff, was questioned, and answered, among other things, as follows:

"Q. Could a man coming down that incline with a truck in front of him, as Bonner was, could he see any wet pulp on the floor, do you think, from those lights? A. I don't know whether he could or not, coming from the outside, coming from the lights. Q. About how many lights were there? A. Well, I don't remember. Q. In the passageway—in the gangway? A. I don't know how many there were. Q. Were there any windows on the side, or any other daylight you could see in there? A. No, sir. Q. How were those lights, those lamps there, with regard to being smoky or dim? A. Dim. Q. Sir? A. They were smoky. Q. How long had they been that way? A. I don't know."

Robert Cook, a witness for the plaintiff, was questioned, and answered, among other things, as follows:

"Q. How were the lights in that passageway? A. Well, the lights seemed to be a little dim. Q. From what cause? A. Well, I don't know, unless it would be from the steam or something, maybe get on the globes, and cause it to be a little dim; something like that. Q. What was the color of the dimness? A. Oh, kind of dark; dark lights; I don't know. Q. Look anything like smoke? A. Yes, it was a little kind of dull. I don't know what color you call it. Q. How many lights did they have through that passageway? A. I don't know. I never counted them. Q. Well, did they have sufficient light there to show up the floor to the men? Mr. Griffith: That calls for a conclusion. Mr. Latourette: I suppose you are correct there as a matter of law. Q. State whether you could see the floor plainly, or anything on the floor? A. No, you couldn't see it very plainly. Q. On account of what? A. Well, on account of the lights being dim; I suppose that was it."

There was also evidence tending to show that the floor of the passageway was more or less wet and slippery, and that pieces of pulp

were permitted to accumulate upon it, thereby rendering it more or less dangerous.

The testimony referred to certainly tended to sustain the alleged negligence on the part of the defendant; and, that being so, the court below was, we think, clearly right in its ruling to the effect that that issue was one to be passed upon by the jury—the defendant to the action having put in issue its alleged negligence; for the law cast upon the defendant company the duty to furnish the plaintiff a safe place, in view of the nature of the employment and of all the facts and circumstances attending it, in which to work. It is also true that the plaintiff assumed the ordinary risks attending his employment, but he had the legal right to rely upon the performance by his employer of its legal duty, and if the place—all things considered—was not safe, by reason of which the plaintiff was subjected to some extraordinary risk or danger, not known, and which he in the exercise of reasonable and ordinary care would not have known, then surely it cannot be properly said as matter of law that the plaintiff assumed any such extraordinary risk or danger.

We are of the opinion that the court below properly submitted the issues in the case to the determination of the jury. San Francisco & P. S. S. Co. v. Carlson (C. C. A.) 161 Fed. 851; Bunker Hill & Sullivan Min. & C. Co. v. Jones, 130 Fed. 819, 65 C. C. A. 363; George v. Clark, 85 Fed. 608, 29 C. C. A. 374; Great Northern Ry. Co. v. McLaughlin, 70 Fed. 674, 17 C. C. A. 330.

The judgment is affirmed.